AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original



LODGED
CLERK, U.S. DISTRICT COURT

**10/29/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ MSV ___ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT

**10/29/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ clee ___ DEPUTY

United States of America

v.

Jose Isabel Torres Jr;
Jonathan Ramirez

Case No.  2:25-mj-06775-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, Christina Wright, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date of February 13, 2025 in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

_____
Christina Wright, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 29, 2025

_____
*Judge's signature*

City and state:    Los Angeles, California

_____
Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA:__Neil Thakor x 6595

## AFFIDAVIT

I, Christina Wright, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against, and arrest warrants for, JOSE ISABEL TORRES JR ("TORRES JR") and JONATHAN RAMIREZ ("RAMIREZ") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution and Possession with Intent to Distribute Methamphetamine).

2.    This affidavit is also made in support of a warrant to search the following digital devices, currently in the custody of the Federal Bureau of Investigation ("FBI") in Santa Maria, California, as described more fully in Attachment A:

   a.    a blue Motorola smartphone, with IMEI 359643652064217 ("SUBJECT DEVICE 1");

   b.    A blue Motorola smartphone, with IMEI 359643652065750 ("SUBJECT DEVICE 2");

   c.    A silver T-Mobile smartphone with a black case ("SUBJECT DEVICE 3");

   d.    A Samsung smartphone with a black case, believed to be RAMIREZ' phone ("SUBJECT DEVICE 4"); and

   e.    A dark gray BLU smartphone with a cracked screen, ("SUBJECT DEVICE 5" and collectively the "SUBJECT DEVICES").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and

distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent ("SA") with the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been since 2024. I am currently assigned to the Los Angeles Field Office, Santa Maria Resident Agency, where my primary focus is the investigation of violent crimes. Prior to my current role, I was an FBI Uniform Police in Washington D.C. as a Police Officer since June 2015.

6.   During my time working for the FBI, I have conducted and assisted in investigations regarding violations of federal law to include narcotics trafficking, complex financial crimes, wire fraud, public corruption, crimes within the special

jurisdiction of the United States of America and violent crimes against children. In connection with these investigations, I have participated in interviews of defendants, witnesses, and victims, as well as participated in the execution of numerous search warrants and reviewed evidence of such violations. Prior to my current assignment, I received training in complex investigations while attending the FBI Special Agent Academy in Quantico, Virginia. This training included, among other things, instruction regarding the legalities of conducting a search, with an emphasis on determining probable cause to do so.

### III. STATEMENT OF PROBABLE CAUSE

### A. TWO SUBJECTS ARE SEEN THROWING CONTRBAND INTO FCC LOMPOC ON SURVEILLENCE VIDEO

7.    Based on my review of law enforcement reports, conversations with other law enforcement officers, my review of video and audio recordings, and my own knowledge of the investigation, I am aware of the following:

8.    On October 18, 2025, at approximately 7:13 a.m., at the Federal Correctional Complex Lompoc ("FCC Lompoc"), in Lompoc, California, two subjects in dark clothing were caught on surveillance footage running along the fence of the old guard tower on the northside of FCC Lompoc. The two subjects are seen on surveillance footage throwing bright yellow objects into the recreation yard of FCC Lompoc. Based on a review of the surveillance footage, it appears the two subjects threw a total of nine objects into the recreation yard.

9.   At approximately 7:20 am, during a routine patrol of the recreation yard prior letting inmates out into the yard, a BOP official found six bright yellow tennis balls in the recreation yard by the fence. The tennis balls were branded with the word "PENN". In addition, the BOP official found SUBJECT DEVICES 1, 2 and 3 each tightly wrapped in bubble wrap in the vicinity of the tennis balls in the recreation yard.

10.  The tennis balls appeared to be cut open and glued back together. The inside of the tennis balls appeared to contain what appeared to be tied off condoms containing a plastic wrapped white substance. Two of the tennis balls contained two bundles of the white substance, while the others all contained just one bundle.  As a result, eight total plastic bundles were retrieved from inside the six tennis balls.

11.  One of the bundles was tested using a Detectachem multi-drug field test. The test showed a presumptive positive result for the presence of methamphetamine. In total, the eight bundles weighed approximately 197 grams of gross weight.

**B.    RAMIREZ AND TORRES JR ARE FOUND NEAR FCC LOMPOC WITH TENNIS BALLS FILLED WITH CONTRABAND**

12.  At approximately 8:00 a.m., while headed home from FCC Lompoc, a BOP officer saw two subjects both wearing matching dark camouflage shirts and dark pants walking near the tree line near the old guard tower of FCC Lompoc.  The two subjects were walking away from the prison on the side of the road heading Northbound on Santa Lucia Road.

4

13.    Based on my training and experience, I am aware that FCC Lompoc is located in a secluded area and surrounded by tree lines. The nearest city area is approximately three miles from FCC Lompoc. The area surrounding FCC Lompoc contains mostly housing for staff, agriculture fields, and a back entrance to Vandenburg Space Force Base. As a result, it is highly unusual to see unknown individuals walking on the side of the road by foot.

14.    Because FCC Lompoc's location in a secluded area, the BOP official activated his emergency headlights believing the two subjects were prison escapees.  One subject, later identified as TORRES JR, was carrying a camouflage bag.  Upon seeing the BOP officer activate his lights, TORRES abandoned the bag in the bushes on the side of the road and continued walking along the road. The BOP officers later retrieved the bag from the bushes. The other subject, later identified as RAMIRIEZ, was carrying a black satchel.

15.    The BOP officers detained the two subjects under the belief they were prison escapees and contacted Lompoc Police Department ("LPD") to be dispatched to the scene. The two subjects identified themselves to the BOP Officers as TORRES JR. and RAMIREZ. Based on a review of law enforcement databases, LPD learned that TORRES JR had an outstanding state warrant for his arrest for a parole violation.

16.    Law enforcement officials took RAMIREZ and TORRES JR into custody and conducted a search incident to arrest on each. During the search of TORRES JR, officers found SUBJECT DEVICE 5,

which was booked as evidence at LPD.  In addition, law enforcement officers searched the camouflage bag abandoned in the bushes by TORRES JR and found a ghillie suit. Based on my training and experience, I am aware that a ghillie suit is a piece of clothing that military personal or hunters use to blend in with their surroundings to avoid being seen.

17.  During the search of RAMIREZ, law enforcement officials found SUBJECT DEVICE 4 in one of RAMIREZ's pants pockets. In addition, LPD officers searched the black satchel bag that RAMIREZ was carrying and found:

a.    one tennis ball, which appeared to be new but cut open and glued back together in a manner similar to the tennis balls found in the recreation yard of FCC Lompoc. In addition, the tennis ball was the same color and brand (yellow, "PENN") as the balls in the recreation yard.

b.    a two-way radio, which contained a light at the top which was still lit. Based on my training and experience, I am aware that most two-way radios come in pairs or groups.

c.    a black balaclava (i.e. a full face covering that covers everything but the eyes);

d.    an inhaler; and

e.    air pods.

18.  Law enforcement officers cut open the tennis ball found in RAMIREZ' satchel at the glue line. Inside was a tied off condom containing a plastic wrapped white substance.  This bundle was tested using a Detectachem field test and tested

positive for the presence of methamphetamine and weighed
approximately 25 grams.

### C. RAMIREZ AND TORRES JR. ARE INTERVIEWED AND GIVE INCONSISTENT STATEMENTS

19. A LPD Detective and I interviewed both TORRES JR and
RAMIREZ. Prior to the interviews, both TORRES JR and RAMIREZ
were read their Miranda rights, and agreed to be interviewed.

20. During the interview with TORRES JR, TORRES JR stated,
in substance and summary, that he came to Lompoc with RAMIREZ,
but claimed he did not know RAMIREZ'S name. TORRES JR. stated he
and RAMIREZ travelled to FCC Lompoc in an Uber. TORRES JR
claimed that he and RAMIREZ were going hiking. When asked why he
was wearing camouflage, TORRES JR told the detective he was
wearing it because he wanted to fit in while he was hiking in
the wilderness. TORRES JR also admitted that he occasionally
uses methamphetamine. TORRES JR then ended the interview.

21. During the interview with RAMIREZ, RAMIREZ stated, in
substance and summary, that he came to FCC Lompoc with TORRES
JR, but that he did not know TORRES JR's name. RAMIREZ stated he
and TORRES JR came to FCC Lompoc by train from Los Angeles,
California. He claimed he came to FCC Lompoc to see a friend who
lives in Lompoc near a Motel 6. RAMIREZ, however, did not know
his friend's name or address. Based on my experience, as well as
discussions with other Lompoc PD officers, as well as my review
of maps of the surrounding area, I am aware there are no houses
near Motel 6 in Lompoc. RAMIREZ admitted SUBJECT DEVICE 4
belonged to him but would not provide the passcode.

22.   RAMIREZ also claimed the black satchel bag that he was seen carrying was not his, and also denied that the contents (including the inhaler) inside the satchel belonged to him. However, based on my conversations with LPD officers, I am aware that prior to the interview with RAMIREZ, RAMIREZ had asked LPD officers for the inhaler from his black satchel and confirmed to LPD officers that the inhaler inside the satchel belonged to him.

23.   Based on my conversations with LPD officers, I am aware that on the same date, LPD received a call from a woman who identified herself as M.S. and as RAMIREZ' girlfriend. M.S. said RAMIREZ left Pomona the night before, and that he was wearing a camouflage long sleeve shirt, black jeans, carrying a small black satchel bag that he recently bought. M.S. said RAMIREZ took a black facemask that you pull over your head to prevent dust from getting on you while working construction. M.S. also confirmed that the inhaler inside the satchel backpack belonged to RAMIREZ. Soledo informed LPD officers RAMIREZ has two cell phones.

### IV. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

24.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug

traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

digital devices, including in the form of calendar entries and location data.

e.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

26.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

27.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

10

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

29. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TORRES JR and RAMIREZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of TORRES JR and RAMIREZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

13

## VI. <u>CONCLUSION</u>

30.  For all the reasons described above, there is probable cause to believe that TORRES JR and RAMIREZ violated 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(viii)(Distribution and Possession With Intent to Distribute Methamphetamine).  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found on the SUBJECTS DEVICES, as described in Attachment A-1.

_____/s/_____
Christina Wright, Special
Agent, Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 4th day of
October 29, 2025.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE